502 A.2d 1359

**COMMONWEALTH of Pennsylvania**

v.

**Charles J. KARCH, Appellant.**

Superior Court of Pennsylvania.

Argued March 25, 1985.

Filed Jan. 17, 1986.

228

Bernard V. O'Hare, Jr., Bethlehem, for appellant.

John F. Spirk, Jr., Assistant District Attorney, Easton, for Com.

Before SPAETH, President Judge, and CIRILLO and SHOYER,* JJ.

CIRILLO, Judge:

After a trial by jury, appellant was convicted of driving under the influence. Post-trial motions were filed and subsequently denied. Appellant was sentenced to pay the costs of prosecution plus a $750.00 fine, and to serve a term

---

* The Honorable Kendall H. Shoyer, Senior Judge of the Court of Common Pleas of Philadelphia County, is sitting by designation.

of imprisonment of not less than thirty days nor more than one year.

Appellant raises two issues on appeal: 1) May the results of blood testing be admitted into evidence without calling the technician who performed the test as a witness; and 2) May the blood test results be admitted into evidence in a drunk driving case when the test does not establish the percentage of "alcohol by weight"?

Appellant's first contention is that the blood-alcohol test results are inadmissible unless the technician who performed the test is called to the witness stand. We disagree. It is well established that hospital records are admissible to show the facts of hospitalization, treatment prescribed, and symptoms present. *Commonwealth v. Di Giacomo*, 463 Pa. 449, 345 A.2d 605 (1975); *Morris v. Moss*, 290 Pa.Super. 587, 435 A.2d 184 (1981); *Commonwealth v. Seville*, 266 Pa.Super. 587, 405 A.2d 1262 (1979); *Commonwealth v. Green*, 251 Pa.Super. 318, 380 A.2d 798 (1977) (en banc) (Spaeth, P.J. joining the majority Opinion). In *Commonwealth v. Seville, supra,* a case directly on point with the one *sub judice,* the Court held that blood-alcohol test results were properly admitted into evidence without the presence of the technician who performed the test. The Court reasoned that the test results were admissible under the hospital records exception to the hearsay rule: since a blood-alcohol test is basic and routine, it is highly reliable and thus rises beyond a mere opinion or conclusion to the level of medical fact. "No such doubts as to reliability and accuracy are entertained when a record is offered merely to prove facts ... *or the existence of some readily ascertained substance or chemical within the body." Id.* 266 Pa.Super. at 592, 405 A.2d at 1264. (Emphasis added). Even if the hospital records are hearsay, "... the elements of trustworthiness serv[e] in place of the safeguards ordinarily afforded by confrontation and cross-examination, which justifies admission of the writing or record without the necessity of calling all persons who may have had a hand in preparing it." *Commonwealth v. Seville,* 266 Pa.Super. at 592, 405 A.2d at 1265.

■ In the case at bar, as in *Commonwealth v. Seville, supra,* the physician who set the protocol for such laboratory procedures explained the blood test results of appellant, even though he was not present when the test was performed. The physician explained that he received and retained the records relative to the test performed, identified the lab and equipment used, and described the technician who performed the test as qualified with more than thirty years of experience. Based upon the logic espoused in the *Seville* case, nothing more is required for the admissibility of the blood-alcohol test results. Therefore, the blood test results were properly admitted into evidence and the weight afforded such tests was properly left for the jury to decide.

■ Alternatively, even without the records being introduced into evidence, the physician (Dr. Stein) could have expressed his medical opinion " ... based in part on reports of others which are not in evidence but upon which the expert customarily relies in the practice of his profession." *Commonwealth v. Gilliard,* 300 Pa.Super. 469, 476, 446 A.2d 951, 954 (1982); *see also Commonwealth v. Thomas,* 444 Pa. 436, 282 A.2d 693 (1971). Since Dr. Stein was an acknowledged expert and the procedure was performed pursuant to the protocol which he established, his testimony alone, without the hospital records, would be admissible.

■ Finally, it is our opinion that the evidence produced against appellant was so overwhelming that the blood-alcohol test results were unnecessary. The arresting officer testified that he saw appellant's car cross the center line at an excessive speed and nearly strike parked cars on both sides of the street. After the officer stopped appellant's car, he observed appellant's "bloodshot watering eyes and ... strong odor of alcohol." Appellant admitted to the officer that he had been drinking and in fact had too much to drink. The officer administered several field sobriety tests which appellant performed very poorly. We fail to see what more is needed to prove appellant was driving under the influence of alcohol on the night in question.

Appellant next alleges the blood-alcohol test results are inadmissible because the test does not establish the percentage of "alcohol by weight" as required by statute,[1] rather it establishes the "alcohol per volume". This issue has not been presented to our courts before, however, courts in other jurisdictions have held that statutes calling for blood-alcohol reading "by weight" are satisfied when the reading is expressed in terms of a percentage as the weight of alcohol per volume of blood.

In *Commonwealth v. Brooks*, 366 Mass. 423, 319 N.E.2d 901 (1974), the Supreme Judicial Court of Massachusetts reasoned that even though the concentration of fluids is properly expressed as the weight of alcohol per unit of volume, a reference to the concentration as "percentage by weight" (as required by the statute), does not make it inadmissible. "In medical and other scientific usage, the concentration of alcohol in the blood is frequently expressed as milligrams of alcohol per milliliters of fluid." *Commonwealth v. Brooks*, 366 Mass. at 430, 319 N.E.2d at 906, quoting Alcohol and Highway Safety, A Report to the Congress from the Secretary of Transportation, U.S. De-

1. § 1547 Chemical test to determine amount of alcohol.

. . . .

(d) Presumptions from amount of alcohol.—If chemical analysis of a person's breath or blood shows:

(1) That the amount of alcohol by weight in the blood of the person tested is 0.05% or less, it shall be presumed that the person tested was not under influence of alcohol and the person shall not be charged with any violation under section 3731(a)(1) (relating to driving under influence of alcohol or controlled substance), or if the person was so charged prior to the test, the charge shall be void ab initio.

(2) That the amount of alcohol by weight in the blood of the person tested is in excess of 0.05% but less than 0.10%, this fact shall not give rise to any presumption that the person tested was or was not under the influence of alcohol, but this fact may be considered with other competent evidence in determining whether the person was or was not under the influence of alcohol.

(3) That the amount of alcohol by weight in the blood of the person tested is 0.10% or more, it shall be presumed that the defendant was under the influence of alcohol.

. . . .

partment of Transportation (1968). This measurement is a weight/volume and is functionally equivalent to the percent by weight which is stated in most statutes. *Commonwealth v. Brooks, supra.*

Measuring body fluids has usually been accomplished through the use of fluids "by volume" and not "by weight"; therefore, the resulting measurements are usually given as "weight-volume" and not "weight-weight". *See* Harger, Medicolegal Aspects of Chemical Tests of Alcoholic Intoxication, 39 J. of Crim.L. & Criminology 402 (1948).

Additionally in *City of Monroe v. Robinson,* 316 So.2d 119 (La.1975), the court was presented with a similar question. The Court in that case quoted Watts, Some Observations on Police Administered Tests for Intoxication, 45 N.C. Law Rev. 34, 50 n. 53 (1966):

> As the pioneering blood-alcohol laboratory reports and studies used the weight/volume quantification, it inevitably happened that the blood-alcohol 'percentage' figures seized upon by the nonexpert lawyers, legislators, and traffic safety enthusiasts were in fact the weight/volume percentage figures. All the widely used testing instruments that report in terms of 'percentage' or 'percentage by weight' of alcohol in the blood actually utilize the weight/volume percentage quantifications.

The article went on to say that unless stated to the contrary, any blood-alcohol percentage figures are expressed in weight/volume measurements.

 Bearing all of the above in mind, it would be difficult to conceive that the statute intended the only admissible blood-alcohol test results had to be measured in terms of alcohol by weight and nothing else. We hold that the language of 75 Pa.C.S. § 1547(d) allows the admission of blood-alcohol test results which establish the "alcohol per volume." Therefore the test results as admitted were in compliance with 75 Pa.C.S. § 1547(d).

Judgment of sentence affirmed.

SPAETH, President Judge, files a dissenting opinion.

SPAETH, President Judge, dissenting:*

The principal issue on this appeal is whether the admission of a hospital record containing the results of a chemical analysis of appellant's blood for its alcohol content violated appellant's right to confrontation. In combination, *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), and *Dutton v. Evans*, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970), hold that where a hearsay statement is important evidence and cross-examination of the declarant is not "wholly unreal," the Confrontation Clause requires the prosecution to prove the declarant's unavailability. Applying this test to the facts of this case, I conclude that the admission of the hospital report violated appellant's right to confrontation. The hearsay statement in the report was that the amount of alcohol by weight in appellant's blood was .243. This evidence was not merely important but devastating. The prosecution, however, did not prove the unavailability of the technician who had tested appellant's blood. Appellant was thereby denied the opportunity to try to show by cross-examination of the technician that the test had been improperly conducted. I should therefore vacate appellant's sentence and remand for a new trial.[1]

1

Appellant was charged with driving under the influence of alcohol[2] and various summary offenses.[3] At the trial the

---

* President Judge SPAETH wrote this opinion before the expiration of his term on the court.

1. Appellant also argues that a proper foundation was not laid for the admission of the blood test results, 75 Pa.C.S. § 1547(a), (c), (g); that the test should have but did not state its results "by weight," 75 Pa.C.S. § 1547(d); and that the hospital report did not satisfy the requirements of the business record exception, 42 Pa.C.S. § 6108(b). For the reasons discussed *infra,* I reject these arguments.

2. Appellant was charged with driving "under the influence of alcohol to a degree which renders the person incapable of safe driving." Act of June 17, 1976, P.L. 162, No. 81, § 1, 75 Pa.C.S. § 3731(a)(1). This provision and related provisions were amended in 1982, Act of Dec. 15, 1982, P.L. 1268, No. 289, § 9, effective in 30 days, but the amendment does not apply to this case.

3. These included reckless driving, driving at an unsafe speed, and driving left of center. The trial court found appellant not guilty of

Commonwealth presented two witnesses, Officer Steven Lindstedt of the Freemansburg Police Department, and Dr. Robert Stein. Their testimony may be summarized as follows.

In the early morning hours of May 26, 1982, Officer Lindstedt saw a car driven by appellant cross the center line, exceed the speed limit, and nearly strike parked cars on both sides of the street. N.T. 14–21. The officer sounded his siren, and when appellant pulled over, the officer noticed appellant's "bloodshot watering eyes and . . . a strong odor of alcohol. . . ." N.T. 24. Appellant admitted to the officer that he had been drinking and had had too much to drink. N.T. 24, 27. He performed several field sobriety tests "very poorly:" he "was swaying from side to side," "was very unsure of himself," and during the finger to nose test, "he would touch or stumble [sic; "fumble?"] around his face. . . ." N.T. 25–26. After arresting appellant for driving under the influence, the officer took him to the Easton Hospital for a blood test. There he saw the hospital laboratory technician, John Cosha, draw a sample of appellant's blood.[4] N.T. 35.

Dr. Stein testified that he "was involved in setting up a protocol procedure [set of directions] for the taking of blood tests for driving under the influence, . . . in conjunction with the pathologists and Easton Hospital", and that copies of the reports of blood tests done at the hospital were sent to his office. N.T. 83–84. The doctor then identified Commonwealth Exhibit No. 1 as a form he had received at his office. The form is entitled "Easton Hospital Drug Monitoring-Toxicology Chart Copy" and purports to report that on May 26, 1982, blood was drawn from appellant at 2:40

reckless driving and driving at an unsafe speed, and guilty of driving left of center. This appeal does not concern the driving left of center conviction.

4. The officer requested a blood test because the breathalyzer equipment was "out of service." N.T. 33. Appellant agreed to the test, N.T. 34, and he does not argue here that the test was improper. See 75 Pa.C.S. § 1547(g) (blood test may be used instead of breath test if person is "physically unable to supply enough breath").

a.m., and was tested at 2:50 a.m., and that the results of the test were "Alcohol 243.7 mg/dl". The form is initialed, and Dr. Stein testified that the initials were John Cosha's. N.T. 86. The form does not record when the entries on it were made, the type of test conducted, the type of machine used, or otherwise whether the protocol that the doctor had set up had been followed. *See* 28 Pa.Code § 5.103 (approving equipment used for blood analysis "by means of gas chromatography, enzymatic procedures, distillation procedures, or diffusion procedures" provided that the equipment is not prohibited and is located in a clinical laboratory licensed by the Department of Health). Appellant objected to admission of the form, stating in part that "there would be no ability on the part of the defendant to make any effective cross-examination concerning the intricacies of the test with respect to the manner in which the sample was drawn, the manner in which the sample was protected, the type of testing that was done, the nature of the equipment and related inquiries that are very material to the validity of this test." N.T. 88–89. The trial court overruled the objection, and Dr. Stein proceeded to explain the results of the test as meaning "243.7 milligrams per deciliter." N.T. 89. "That's a measure of the actual physical amount of alcohol in the blood." *Id.* On cross-examination he further explained: "That's 243 milligrams, which is a weight measure for a deciliter, which is an amount of fluid." N.T. 95. "That refers to milligrams percentage that then becomes a percentage of the alcohol in the blood." N.T. 96. When asked, "A percentage by weight or a percentage by quantity?" the doctor replied, "By weight and volume." *Id.* Appellant testified that he had had three pony bottles of Rolling Rock between 11:00 p.m. and 1:00 a.m. N.T. 110–11. He further states that he did not stray from the right lane, exceed the speed limits except perhaps when shifting and then perhaps only 5 m.p.h. above the speed limit, or have any close calls with the cars parked along the road. N.T. 112, 114. After the police officer stopped appellant, he admitted he had difficulty getting his owner's card and driver's license out, N.T. 117, and he may have staggered

for a couple of seconds as he got out of the car because he works standing and after sitting for awhile he sometimes has this problem, N.T. 131. In regard to the field sobriety tests, appellant testified that he did perform the finger to nose test but may not have pointed where the officer wanted him to, N.T. 119, that he was unable to walk heel to toe but would not be able to do that anyway without looking, N.T. 119–20, that he did not fall when he walked toward the officer, N.T. 120, and that he did not tell the officer that he had drunk too much but only that he had been drinking, N.T. 121. The jury nevertheless convicted appellant of driving while under the influence of alcohol.

### 2

Before considering appellant's argument that his right to confrontation was violated, we should consider his arguments that the Easton Hospital report was inadmissible because (a) the Commonwealth failed to lay a proper foundation for the results of the blood test, (b) the results did not present a measure of alcohol by weight in appellant's blood, and (c) the report does not fit within the business record exception.[5] I reject each of these arguments.

### a

Appellant's argument that the Commonwealth failed to lay a proper foundation for the results of the blood test turns upon whether the test was conducted by a qualified person. Chemical tests to determine the amount of alcohol in a driver's blood are provided for by 75 Pa.C.S. § 1547. Subsection (g), as in effect when appellant was arrested, provided that

> [i]f for any reason a person is physically unable to supply enough breath to complete a chemical test, a physician or nurse or a technician acting under a physician's direction may withdraw blood for the purpose of determining its alcoholic content. The chemical analysis of the blood

---

5. I address the arguments in this order because as a matter of judicial restraint a case should not be decided on constitutional grounds if it can be decided on other grounds. *See Commonwealth v. Monumental Properties, Inc.*, 459 Pa. 450, 329 A.2d 812 (1974).

taken under these circumstances shall be admissible in evidence in the same manner as are the results of the breath chemical test. ....

75 Pa.C.S. § 1547(g).

The admissibility of breath chemical tests was governed by subsection (c), which provided:

> In any summary proceeding or criminal proceeding in which the defendant is charged with driving a motor vehicle while under the influence of alcohol, the amount of alcohol in the defendant's blood, as shown by a chemical analysis of his breath or blood, which analysis was conducted with equipment of a type approved by the Department of Health and operated *by qualified personnel*, shall be admissible in evidence.

75 Pa.C.S. § 1547(c) (emphasis added).

"Qualified personnel" meant "a physician or a technician acting under the physician's direction or a police officer who has fulfilled [certain] training requirements...." 75 Pa. C.S. § 1547(a). Appellant argues that the Commonwealth did not establish that the test of his blood was performed by "qualified personnel", Brief for Appellant at 9–10, and that this failure rendered the report inadmissible. *See Commonwealth v. Sweet*, 232 Pa.Super. 372, 335 A.2d 420 (1975) (statutory elements of foundation for test are necessary for admission of the test results).[6]

I am not persuaded by this argument. Dr. Stein testified that the technician who administered the test "[was] certified and qualified to perform this type of analysis," N.T. 86, and that a protocol devised by him was in use at Easton Hospital on May 26, 1982, when the test was performed, N.T. 83–84. I think that this testimony was sufficient to show that the test was performed by "a technician acting under the physician's direction." 75 Pa.C.S. § 1547(a). Appellant concedes that if the protocol established by Dr. Stein

---

**6.** Appellant does not argue that the equipment was not approved by the Department of Health. Although no certificate to that effect was offered in evidence, Dr. Stein testified that the equipment had been approved. N.T. 85.

was followed by the technician, then the technician was qualified within the meaning of 75 Pa.C.S. § 1547(a), Brief for Appellant at 9–19, but he argues that Dr. Stein was unable to say on the basis of his own knowledge that the protocol was in fact followed, and further, that the hospital report did not say it was, *id.* I acknowledge that this argument has some force. I think, however, that it goes to the weight of the evidence rather than to whether a sufficient foundation was laid to justify its admission. *Cf. Commonwealth v. Gilbert,* 254 Pa.Super. 579, 386 A.2d 101 (1978) (evidence that police officer had taken course of instruction on equipment and was certified to administer test sufficient to satisfy requirement that test be administered by qualified personnel).

### b

Appellant also argues that the results of the blood test were inadmissible because the measure, 243.7 milligrams per deciliter, was a weight to volume measure. *See* Dr. Stein's testimony, N.T. 95–97. In appellant's view, the statute required that it be a weight to weight measure.[7]

The provisions in the statute referring to "the amount of alcohol by weight", 75 Pa.C.S. § 1547(d), can be traced to

7. The statute, as in effect when appellant was arrested, provided:
 (d) Presumptions from amount of alcohol.—If chemical analysis of a person's breath or blood shows:
 (1) That the amount of alcohol by weight in the blood of the person tested is 0.05% or less, it shall be presumed that the person tested was not under the influence of alcohol and the person shall not be charged with any violation under section 3731(a)(1) (relating to driving under the influence of alcohol or controlled substance), or if the person was so charged prior to the test, the charge shall be void ab initio.
 (2) That the amount of alcohol by weight in the blood of the person tested is in excess of 0.05% but less than 0.10%, this fact shall not give rise to any presumption that the person tested was or was not under the influence of alcohol, but this fact may be considered with other competent evidence in determining whether the person was or was not under the influence of alcohol.
 (3) That the amount of alcohol by weight in the blood of the person tested is 0.10% or more, it shall be presumed that the defendant was under the influence of alcohol.
 75 Pa.C.S. § 1547(d).
 The provision was amended in 1982. *See* note 2, *supra.*

the Act of July 28, 1961, P.L. 918, § 1, 75 P.S. § 624.1, which applied only to breath tests.[8] This statute did not and still does not provide guidance regarding the measurement of "the amount of alcohol by weight", but some guidance is provided by the fact that the statute was derived from recommendations of committees of the National Safety Council and American Medical Association. Pa. House Leg.J., June 13, 1961, at 2266–67 (remarks of Rep. Fineman). Professor Harger, an original member of the committee that drafted the National Safety Council recommendations, later wrote that the measurement is "usually given as weight-volume and not weight-weight." Medicolegal Aspects of Chemical Tests of Alcohol Intoxication, 39 J.Crim.L. & Criminology 402 (1948). The measurement term "by weight" is commonly used throughout the United States, usually without explanation of how it is to be computed.[9] *See Commonwealth v. Brooks*, 366 Mass. 423, 429 n. 6, 319 N.E.2d 901, 905 n. 6 (1974). Statutes that do specify how the measurement "by weight" is to be computed, however, generally specify weight/volume. *Id.* Moreover, weight/volume is the scientifically accepted method of computing blood alcohol concentrations. *See id.* at 430, 319 N.E.2d at 906.[10] *See also* Uniform Vehicle Code Annotated

8. A subsequent amendment, Act of July 31, 1968, P.L. 758, No. 237, § 1, applied to breath, blood, and urine tests, and reduced the point of presumptive intoxication from 0.15 to 0.10 percent. The statute applicable to appellant, Act of June 17, 1976, P.L. 162, No. 81, § 1, did not alter the point at which intoxication is presumed but limited the presumption to blood and breath tests. *See also*, note 2, *supra*.

9. The Uniform Vehicle Code (1944) provided a presumption that a defendant was driving under the influence of intoxicating liquor where chemical analysis indicated "0.15 percent or more by weight of alcohol in the defendant's blood." § 11–902(b). No clarification of the meaning of "by weight" was included until 1962, when the Code was amended to provide that "[p]er cent by weight of alcohol in the blood shall be based upon milligrams of alcohol per one hundred cubic centimeters of blood." The Code, apparently the model for many state statutes, including Massachusetts', was construed in *Commonwealth v. Brooks*, 366 Mass. 423, 319 N.E.2d 901 (1974), to provide for measurement by weight/volume.

10. It appears that the Uniform Chemical Test Act (1957) departed from the scientifically accepted methods. The Act provided that the amount of alcohol by weight should be measured as "percent by

§ 11–902(b), Historical Note (Annual Supplement 1970) (Code measure "based on a weight/volume ratio [ ] [is] consistent with accepted scientific practice"); Watts, Some Observations on Police Administered Tests for Intoxication," 45 N.C.Law Rev. 34, 50 n. 53 (1966) ("It can be safely assumed in the entire field of chemical testing that, unless the contrary is indicated, all blood-alcohol percentage figures express weight/volume relationships.").

Given this background, it cannot be maintained that the reference in the statute to "the amount of alcohol by weight" unambiguously means that the amount of alcohol is to be measured by a ratio of weight to weight; the reference may equally readily be understood to provide for a weight to volume measurement and that is the way I believe the statute should be construed, for that is the measurement consistent with accepted scientific practice and with the scientific community's understanding of measurement "by weight." *See Monroe v. Robinson*, 316 So.2d 119 (La.1975); *Commonwealth v. Bernier*, 366 Mass. 717, 322 N.E.2d 414 (1975); *State v. Lockamy*, 65 N.C.App. 75, 308 S.E.2d 750 (1983); *State v. McKinney*, 605 S.W.2d 842 (Tenn.Crim.App.1980). *Cf.* 1 Pa.C.S. § 1903 (formerly 46 P.S. § 533) ("technical words and phrases and such others as have acquired a peculiar and appropriate meaning ... shall be construed according to such peculiar and appropriate meaning or definition"). It follows from this conclusion that amount of alcohol in appellant's blood was measured in compliance with 75 Pa.C.S. § 1547(d).

c

Appellant also argues that the hospital report containing the results of the blood test did not fall within the business record exception to the hearsay rule. This argument is in two parts: first, whether the report was authenticated by a "qualified witness", 42 Pa.C.S. § 6108(b); and second, if it was, whether the entry recording the results of the blood

weight of alcohol in the blood ... based upon milligrams of alcohol per one hundred milligrams of blood." § 7(d). The Act was withdrawn as obsolete in 1970.

test represented "[a] record of an act, condition or event," *id.*

i

The Uniform Business Records as Evidence Act, Act of July 6, 1976, P.L. 586, No. 142, § 2, 42 Pa.C.S. § 6108, provides:

> (b) General Rule.—A record of an act, condition or event shall, insofar as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business at or near the time of the act, condition or event, and if, in the opinion of the tribunal, the sources of information, method and time of preparation were such as to justify its admission.
>
> (c) Definition.—As used in this section "business" includes every kind of business, profession, occupation, calling, or operation of institutions whether carried on for profit or not.
>
> *Id.*

Dr. Stein did not state the nature of his affiliation with the Easton Hospital. It therefore may not be said that when he testified to the identity of the hospital report containing the entry that recorded the results of the blood test, he was testifying as "the custodian" of the report. The statute makes plain, however, that testimony *either* by the custodian *"or* other qualified witness" may suffice. 42 Pa.C.S. § 6108(b) (emphasis added). The question we must decide, therefore, is whether Dr. Stein was such another witness.

Our Supreme Court has stated that a witness is qualified to identify a business record if the witness "possess[es] adequate knowledge of the regularity of the recordkeeping process...." *In re Estate of Indyk*, 488 Pa. 567, 573, 413 A.2d 371, 374 (1979). Here, the record shows that Dr. Stein set up the protocol for the test; he regularly received from the hospital copies of reports of blood tests; among these, he received a copy of the report of the test of appellant's blood; he could identify the technician who drew the sample of appellant's blood and then tested it; and he could say

that the technician was certified to perform the test, and that the equipment used was approved by the Department of Health. I think that this evidence was enough to show that the doctor was "qualified" to testify to the report's "identity and the mode of its preparation; and if it was made in the regular course of business at or near the time...." 42 Pa.C.S. § 6108(b).

ii

Not every entry in a business record is admissible; it must be "[a] record of an act, condition or event...." 42 Pa.C.S. § 6108(b). In considering appellant's argument that the entry recording the results of the blood test was not such a record, I have found the cases by no means as clear as they might be.

In *Commonwealth v. DiGiacomo,* 463 Pa. 449, 345 A.2d 605 (1975), it was argued that the trial court should have admitted the entry in a hospital record of the doctor's admitting diagnosis of the injuries sustained by the defendant's friend; it was the defendant's contention that he had killed the victim in an effort to protect his friend. In sustaining the trial court's refusal to admit the entry, our Supreme Court stated that "[t]he law is clear that hospital records are admissible to show the fact of hospitalization, treatment prescribed, and symptoms given. Medical opinion contained in the records and proffered as expert testimony is not admissible however where the doctor is not available for cross-examination." *Id.,* 463 Pa. at 455–56, 345 A.2d at 608 (citations omitted). The entry of the doctor's admitting diagnosis, the Court stated, was "in the nature of expert opinion testimony and accordingly was properly excluded." *Id.,* 463 Pa. at 456, 345 A.2d at 608. In *Commonwealth v. Campbell,* 244 Pa.Super. 505, 368 A.2d 1299 (1976), I expressed the view, in dissent, that under *DiGiacomo,* an entry in a hospital record that spermatozoa had been found in the prosecutrix's vagina should have been excluded as an opinion that "the untrained layman would not be competent to make." *Id.,* 244 Pa.Superior Ct. at 514, 368 A.2d at 1303 (SPAETH, J., dissenting);

Judge HOFFMAN was also of this view. *Id.*, 244 Pa.Superior Ct. at 511, 368 A.2d at 1302. The majority of the court, however, were of the view that the trial court had "correctly analyzed the finding of spermatozoa ... as one of fact. Tests to determine the presence of sperm are basic and routine and leave little room for error. Either there was spermatozoa present in her vagina or there was not." *Id.*, 244 Pa.Superior Ct. at 510, 368 A.2d at 1301. In reaching this conclusion, the majority acknowledged *DiGiacomo*, but it cited it for the limited proposition that "conclusions" were inadmissible, going on to say that "[u]ltimately, every fact can be considered a conclusion," but that "[w]hen a circumstance becomes very routine or basic it is designated as a fact." *Id.*, 244 Pa.Superior Ct. at 509–10, 368 A.2d at 1301. Thus the majority indicated that *DiGiacomo* should be understood as not forbidding the admission of every entry in a hospital record that stated a conclusion, or expressed an opinion; when the trial court could properly find the conclusion so "basic and routine" as to "leave little room for error", the entry could be admitted as a record of "fact." This view was in its general approach very similar to the approach taken by Justice ROBERTS and Justice POMEROY in their concurring opinions in *DiGiacomo*, 463 Pa. at 452–62, 345 A.2d at 608–11. It was also similar to Federal practice. *See* Fed.R.Evid. 803(6) (providing for the admission of an entry of "opinions, or diagnoses", with the trial court having discretion to exclude the entry if "the source of information or the method or circumstances of preparation indicate lack of trustworthiness"); *see also* 4 J. Weinstein and M. Berger, Weinstein's Evidence ¶ 803(6)[6] (1985).

In subsequent decisions this court has adhered to, and has developed, the view expressed by the majority in *Campbell*. *See Commonwealth v. Sabb*, 269 Pa.Super. 206, 409 A.2d 437 (1979) (hospital record showing presence of sperm admissible); *Commonwealth v. Seville*, 266 Pa.Super. 587, 405 A.2d 1262 (1979); *and see Emerick v. Carson*, 325

Pa.Super. 308, 472 A.2d 1133 (1984); *Commonwealth v. Gilliard,* 300 Pa.Super. 469, 446 A.2d 951 (1982).

In *Seville* the opinion was by Judge HESTER; Judge MONTGOMERY concurred in the result; I also concurred in the result, with a concurring statement. The issue was the same as the issue that we are discussing here—the admissibility under the Uniform Business Records as Evidence Act of an entry in a hospital record stating the results of a blood alcohol test. Judge HESTER held that the entry was admissible as "in the realm of medical fact." *Id.* 266 Pa.Super. at 594, 405 A.2d at 1266. His review of the authorities persuaded him that "[t]he standarized, precise calculations used in arriving at the final result [of a blood alcohol test] leave little room for error." *Id.,* 266 Pa.Superior Ct. at 593, 405 A.2d at 1265.[11]

Although Judge HESTER's opinion did not command a majority, the principle enunciated by it has been adopted by subsequent panels of this court and therefore now binds this panel. In *Commonwealth v. Gilliard, supra,* the panel, citing *Seville* with approval, held that a doctor could testify to the results of a toxicology report even though he did not perform the tests, *id.* 300 Pa.Super. at 476, 446 A.2d at 954, and in *Emerick v. Carson, supra,* the panel held hospital records showing blood alcohol test results admissible, citing *Seville* as having "recognized that blood alcohol tests are undeniably accurate and that their results should be viewed as medical facts," *id.* 325 Pa.Super. at 314 n. 1, 472 A.2d at 1136 n. 1. *Cf. Morris v. Moss,* 290 Pa.Super. 587, 435 A.2d 184 (1981) (admission of hospital record showing patient conscious held error; determination not a rou-

11. Among the authorities cited by Judge HESTER was the statement in MacDonald, Alcoholism as a Medicolegal Problem, 11 Clev.Mar.L. Rev. 39, 51 (1962), that "[p]roviding a careful technique is used, blood and alcohol tests should not have an error exceeding plus or minus three percent in alcohol concentrations of 0.1 percent and over." *But see* Comment, "The New Pennsylvania Drunk Driving Law: Last Call for the One-For-The-Road Era," 87 Dick.L.Rev. 805, 818 (1983), stating that one of the difficulties with blood tests is "that [, according to a state survey,] the methods used to derive a BAC [blood alcohol content] percentage in the best laboratories yield a standard deviation of at least three percent."

tine finding of fact but an application of scientific principles; *Seville* quoted with approval). I therefore conclude that the entry of the results of the blood alcohol test of appellant's blood was an entry of fact within the requirement of the Uniform Business Records as Evidence Act, that to be admissible, a business record must be "[a] record of an act, condition or event...." 42 Pa.C.S. § 6108(b).[12]

### 3

If this were a civil case, the foregoing conclusions would end my inquiry. The United States Supreme Court has held, however, that the Confrontation Clause is not congruent with the hearsay evidence rule. *California v. Green*, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d (1970). Accordingly, in a criminal case the admission of hearsay, even though within an exception to the rule against hearsay evidence, may violate the defendant's right to be confronted by his accusers. I must therefore consider appellant's final argument, that if the record of the results of the blood alcohol test was within the business record exception to the rule against hearsay, as I have concluded it was, still, admission of the record was a violation of his right to confrontation.[13]

### a

The United States Supreme Court has long considered the conflict between admitting hearsay evidence and preserving the defendant's right to confrontation. *See, e.g., Mattox v. United States*, 146 U.S. 140, 13 S.Ct. 50, 36 L.Ed. 917 (1892) (dying declaration); *Mattox v. United States*, 156 U.S. 237, 15 S.Ct. 337, 39 L.Ed. 409 (1895) (former trial testimony).

---

12. At trial, appellant also objected to the hospital report on the ground that "[it] is a record prepared expressly for the purpose of litigation and is not prepared in the ordinary every day course of business." N.T. 102. Appellant does not make that argument here and therefore has waived it.

13. Appellant's argument, as I understand it, is based on the United States Constitution, U.S. Const. amends. VI and XIV, not on the Pennsylvania Constitution, Pa. Const., art. I, § 9. *Pointer v. Texas*, 380 U.S. 400, 403, 85 S.Ct. 1065, 1067, 13 L.Ed.2d 923 (1965), held the Sixth Amendment "obligatory on the States by the Fourteenth Amendment."

The Court has consciously avoided formulating a uniform rule, *California v. Green, supra* 399 U.S. at 162, 90 S.Ct. at 1937, proceeding instead on a case-by-case basis. In *Ohio v. Roberts, supra,* the Court affirmed its intention to continue to proceed in this manner, *id.* 448 U.S. at 64, 65 n. 9, 100 S.Ct. at 2939 n. 9, but at the same time it suggested that the following "general approach" was "discernible [from its past decisions]":

> The Confrontation Clause operates in two separate ways to restrict the range of admissible hearsay. First, in conformance with the Framers' preference for face-to-face accusation, the Sixth Amendment establishes a rule of necessity. In the usual case (including cases where prior cross-examination has occurred), the prosecution must either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant. [Citations and footnote omitted; we quote from and discuss this footnote, *infra.*]

> The second aspect operates once the witness is shown to be unavailable. Reflecting its underlying purpose to augment accuracy in the factfinding process by ensuring the defendant an effective means to test adverse evidence, the Clause countenances only hearsay marked with such truthworthiness that "there is no material departure from the reason of the general rule." *Snyder v. Massachusetts,* 291 U.S. [97,] 107 [54 S.Ct. 330, 333, 78 L.Ed. 674] [1934].

*Id.* at 65, 100 S.Ct. at 2538.

This statement, however, is attended by certain difficulties. Perhaps the principal difficulty is the uncertainty caused by the Court's statement that the prosecution has the burden of producing, or demonstrating the unavailability of, the declarant "[i]n the usual case." (*And see also* the Court's later statement, *id.* at 66, 100 S.Ct. at 2539, that "the Confrontation Clause normally requires a showing [of unavailability].") This qualification necessarily suggests the question, When will the prosecution not have the burden because the case is not a "usual", or "normal[ ]", case?

The Court supplied no answer to this question, except as an answer may be suggested by the Court's footnote to its statement that "[i]n the usual case", the prosecution has the burden of demonstrating unavailability. This footnote, footnote 7, reads in part as follows:

A documentation of unavailability, however, is not always required. In *Dutton v. Evans,* 400 U.S. 74 [91 S.Ct. 210, 27 L.Ed.2d 213] (1970), for example, the Court found the utility of trial confrontation so remote that it did not require the prosecution to produce a seemingly available witness....

448 U.S. at 65 n. 7, 100 S.Ct. at 2539 n. 7.

In *Dutton* the issue was whether the Confrontation Clause precluded testimony of what a co-conspirator had said even though the declarant was apparently available. It was held that the Confrontation Clause did not preclude admission of the testimony. In the view of the plurality, the hearsay in question was of marginal significance to the prosecution:

This case does not involve evidence in any sense "crucial" or "devastating,".... It does not involve the use, or misuse of a confession made in the coercive atmosphere of official interrogation, as did *Douglas* [*v. Alabama,* 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965)], *Brookhart* [*v. Janis,* 384 U.S. 1, 86 S.Ct. 1245, 16 L.Ed.2d 314 (1966)], *Bruton* [*v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968)], and *Roberts* [*v. Russell,* 392 U.S. 293, 88 S.Ct. 1921, 20 L.Ed.2d 1100 (1968)]. It does not involve any suggestion of prosecutorial misconduct or even negligence, as did *Pointer* [*v. Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965)], *Douglas,* or *Barber* [*v. Page,* 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968)]. It does not involve the use by the prosecution of a paper transcript, as did *Pointer, Brookhart,* and *Barber.* It does not involve a joint trial, as did *Bruton* and *Roberts.* And it certainly does not involve the wholesale denial of cross-examination, as did *Brookhart.*

400 U.S. at 87, 91 S.Ct. at 219.

In addition, the plurality found that the hearsay had such indicia of reliability that "the possibility that cross-examination of [the declarant] could conceivably have shown the jury that the statement, though made, might have been unreliable was wholly unreal." *Id.* at 89, 91 S.Ct. at 220.

b

Since *Ohio v. Roberts,* both Federal and State courts have considered the issue of when the prosecution has the burden of producing, or demonstrating the unavailability of, the declarant. The cases involve a variety of situations, and it is probably impossible, and in any event the attempt would not be useful here, to reconcile all of them.[14] A generaliza-

---

14. Among the decisions by other courts are the following:

*Payne v. Janasz,* 711 F.2d 1305 (6th Cir.), *cert. denied,* 464 U.S. 1019, 104 S.Ct. 552, 78 L.Ed.2d 726 (1983); *United States v. Foster,* 711 F.2d 871 (9th Cir.1983), *cert. denied,* 465 U.S. 1103, 104 S.Ct. 1602, 80 L.Ed.2d 132 (1984); *Mattes v. Gagnon,* 700 F.2d 1096 (7th Cir.1983); *United States v. Penn,* 721 F.2d 762 (11th Cir.1983); *United States v. Fleishman,* 684 F.2d 1329 (9th Cir.), *cert. denied,* 459 U.S. 1044, 103 S.Ct. 464, 74 L.Ed.2d 614 (1982); *United States v. Washington,* 688 F.2d 953 (5th Cir.1982); *United States v. Keplinger,* 572 F.Supp. 1068 (N.D.Ill.1983); *Howard v. United States,* 473 A.2d 835 (D.C.App.1984); *State v. Spikes,* 67 Ohio St.2d 405, 423 N.E.2d 1122 (1981), *appeal dism.,* 454 U.S. 1131, 102 S.Ct. 986, 71 L.Ed.2d 284 (1982); *Hagenkord v. State,* 100 Wis.2d 452, 302 N.W.2d 421 (1981).

For some pre-*Roberts* decisions, *see United States v. Smith,* 521 F.2d 957 (D.C.Cir.1975) and cases cited therein.

Professor Graham has suggested that the prosecution should bear the burden of producing, or demonstrating the unavailability of, the declarant when the hearsay is "accusatory in nature when made." Graham, Handbook of Federal Evidence.§ 803.6, at 824 n. 33 (1981), *quoting* Graham, The Confrontation Clause, the Hearsay Rule, and the Forgetful Witness, 56 Tex.L.Rev. 151, 192–94 (1978). He explains:

A statement is accusatory in nature ... if it is made under circumstances that evidence, first, an intent of the declarant to accuse or charge someone with conduct that is criminal, or second, an awareness by the declarant of a reasonable possibility that the statement may be of assistance to the Government in the apprehension or prosecution of any person who may be charged with having committed any crime.

*Id.*

In *United States v. Keplinger, supra,* the District Court for the Northern District of Illinois incorporated Professor Graham's point in its determination:

Accordingly, based on these important public policy considerations, and based on the court's finding that the business records admitted

tion, however, is that the courts have not attempted to state a general rule. Instead, adopting the approach implied in footnote 7 in *Roberts*, they have for the most part proceeded on a case-by-case basis, imposing the burden of proving unavailability or not depending on their appraisal of the relative weights of the factors identified in *Dutton*, *i.e.* the importance of the evidence and the usefulness of cross-examination. For our purposes, of course, the most pertinent of these decisions are our Supreme Court's and our own, and while these are perhaps not entirely uniform,[15] they nevertheless make plain enough what our decision here must be.

In *Commonwealth v. Thomas*, 443 Pa. 234, 279 A.2d 20 (1971), the hearsay in question fell within the state of mind exception. The issue of the prosecution's burden of proof was not implicated, for the declarant was the victim of the homicide of which the defendant had been convicted, but the case is important to our consideration because the Court specifically rested its analysis on *Dutton*. Quoting *Dutton*, and also *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), the Court defined its task as appraising how "crucial", *Dutton*, or "damaging", *Bruton*, the hearsay was, and how important cross-examination was to its evaluation. After examining the record by this standard, the Court concluded that the Confrontation Clause did

in this case are reliable, the value of cross-examination of each person who made each entry in these records would be minimal, and the records admitted by the court are not accusatory in nature, the court concludes that the Confrontation Clause does not require a showing of unavailability of the maker of business records in this case.

572 F.Supp. at 1072.

*Cf.* Seidelson, Hearsay Exceptions and the Sixth Amendment, 40 Geo.Wash.L.Rev. 76, 92–93 (1971).

**15.** In *Commonwealth v. Seville*, 266 Pa.Super. 587, 405 A.2d 1262 (1979), this court expressly declined to address the confrontation issue because it had not been argued. I am therefore unable to agree with the majority's view that *Seville* is dispositive. *See* the majority's op. at 1361–1362. In *Commonwealth v. Scatena*, 332 Pa.Super. 415, 481 A.2d 855 (1984), and *Commonwealth v. Campbell*, 244 Pa.Super. 505, 368 A.2d 1299 (1976), the defendant's confrontation argument was rejected but without explanation.

not preclude admission of the hearsay; the hearsay tended to prove the relationship between the declarant and the defendant, and that the relationship did exist was shown by other evidence, the admissibility of which was not questioned. *Id.* 443 Pa. at 243–44, 279 A.2d at 25–26.

In *Commonwealth v. McCloud,* 457 Pa. 310, 322 A.2d 653 (1974), the issue of the prosecution's burden of proving unavailability was the central issue. There the Court held that the Confrontation Clause precluded admission of an entry in an autopsy report on the cause of death. The Court, citing *Dutton* and quoting from its earlier decision in *Thomas,* noted that the autopsy report might have been properly admitted to establish the fact of death, that the autopsy had been performed, or the identity of the person who performed it, *id.,* 457 Pa. at 315, 322 A.2d at 656, but held that to prove the cause of death, use of the autopsy report "as a business records exception to the hearsay rule ... is impermissible unless the accused is afforded the opportunity to confront and cross-examine the medical examiner who performed the autopsy, absent a compelling necessity", *id.* It appeared that the Commonwealth had not called the medical examiner to testify because he was attending a convention. The Court expressly found that this did not "constitute[ ] a sufficiently compelling necessity to override the constitutional mandate." *Id.,* 457 Pa. at 315 n. 5, 322 A.2d at 657 n. 5. The Court pointed out that "[t]he defense would have been able to submit the reliability of the examiner's opinion to the jury's scrutiny. Any weakness could have been unearthed." *Id.,* 457 Pa. at 313, 322 A.2d at 655 (footnote omitted). The Court acknowledged that "production of a critical witness may be inconvenient", *id.,* 457 Pa. at 316, 322 A.2d at 657, but held that the right of confrontation could not be denied on the basis of inconvenience to the prosecution. "Here", the Court said, "the Commonwealth could have produced the maker of the autopsy report, but did not." *Id.,* 457 Pa. at 317, 322 A.2d at 657.

In *Commonwealth v. Pinkins*, 343 Pa.Super. 44, 493 A.2d 1365 (1985), this court considered the issue of the prosecution's burden of proving unavailability. The hearsay in question was within the co-conspirator exception to the hearsay rule. The record showed that the Commonwealth "failed either to produce [the declarant] or to adduce reasons for his unavailability." *Id.*, 343 Pa.Superior Ct. at 52, 493 A.2d at 1369. The Commonwealth contended, however, that it was not required to prove unavailability, and that the defendant "had a chance to subpoena [the declarant] but chose not to do so." *Id.*, 343 Pa.Superior Ct. at 52, 493 A.2d at 1369. The majority of the panel, quoting footnote 7 of *Roberts*, noted that "[a] demonstration of unavailability [by the prosecutor] is not always required," and that in *Roberts*, this proposition was supported by citation of *Dutton*. The majority then proceeded to examine the record and concluded that the hearsay was not "of peripheral significance at most" (quoting *Dutton*, 400 U.S. at 87, 91 S.Ct. at 219), but rather, "sharply tipped the scales against the [defendant]", *id.*, 343 Pa.Superior Ct. at 54, 493 A.2d at 1370, because it tended to prove his "complicity in the enterprise", *id.*, 343 Pa.Superior Ct. at 51, 493 A.2d at 1368. "Because", the majority stated, "the independent evidence upon which the Commonwealth relied for introduction of the out-of-court statements was so tenuous, it was highly important that any out-of-court statements be unequivocal and that the declarant be subject to searching cross-examination." *Id.*, 343 Pa.Superior Ct. at 51, 493 A.2d at 1369. In these circumstances, the majority held, the Commonwealth did have the burden of demonstrating unavailability, and since it had failed to meet that burden, admission of the hearsay was precluded by the Confrontation Clause. Judge ROWLEY, in dissent, did not disagree on the applicability of *Dutton*. Rather, he stated that in his view of the record, the hearsay was corroborated by the defendant's own statements and in any event was not crucial to the case, so that his application of *Dutton* led him to conclude that the Confrontation Clause was not violated.

In *Commonwealth v. McNaughton*, 252 Pa.Super. 302, 381 A.2d 929 (1977), this court held that even if under *DiGiacomo* a doctor's statement in a hospital report (identifying the drug the defendant was charged with possessing) was admissible under the business record exception, still, under the Supreme Court's decision in *McCloud*, admission of the report violated the defendant's right to confrontation because the report was the "sole basis for the drug charge." *Id.*, 252 Pa.Superior Ct. at 309, 381 A.2d at 932.

Finally, in *Commonwealth v. Green*, 251 Pa.Super. 318, 380 A.2d 798 (1977), while we did not expressly cite *Dutton*, our analysis was consistent with it. There the admission of an entry in a medical report was held not to violate the defendant's right to confrontation. Citing *DiGiacomo*, we emphasized that the entry ("excoriations of the left elbow and right forehead") was of a "readily observable physical condition ... as easily ... ascertained by the lay person as by the trained physician." *Id.*, 251 Pa.Superior Ct. at 323, 380 A.2d at 801. The need for confrontation was therefore minimal.

Several conclusions are apparent from these decisions:

*First:* Whether the Confrontation Clause precludes the admission of hearsay is not to be decided by application of any general rule. Thus it may not be said that hearsay within a particular exception to the rule against hearsay, as, for example, the business record exception, is, or is not, inadmissible because of the Confrontation Clause. *Ohio v. Roberts, supra; California v. Green, supra; Commonwealth v. Thomas, supra.*

*Second:* "In the usual case", however, the Confrontation Clause requires that the prosecution "either produce, or demonstrate the unavailability of, the declarant." *Ohio v. Roberts, supra* 448 U.S. at 65, 100 S.Ct. at 2538.

*Third:* In some cases, the prosecution need not demonstrate unavailability. These cases are cases in which the hearsay was not "crucial" but rather "peripheral" to the

prosecution, and where the possibility that cross-examination would have shown the hearsay to be unreliable was "wholly unreal." *Dutton v. Evans, supra* 400 U.S. at 87, 89, 91 S.Ct. at 219; *and see Ohio v. Roberts, supra* 448 U.S. at 65 n. 7, 100 S.Ct. at 2538 n. 7.

*Fourth:* Whether hearsay is "crucial" or "peripheral" will depend on the particular facts of the case. Where the hearsay tended to prove a fact already proved by other evidence the admissibility of which was not questioned, it has been found peripheral. *Commonwealth v. Thomas, supra. See also Commonwealth v. Green, supra.* Hearsay has been found "crucial" where it tended to prove an element of the offense, *Commonwealth v. McCloud, supra* (cause of death); *Commonwealth v. McNaughton, supra* (identification of contraband), or "sharply tipped the scales" against the defendant, *Commonwealth v. Pinkins, supra.*

*Fifth, and finally:* Although *Dutton* identified two factors to be considered—the importance of the evidence and the usefulness of cross-examination—it is apparent that when the hearsay is "crucial", the argument that the prosecution has the burden of demonstrating the unavailability of the declarant is, while not quite irrebutable, nevertheless very compelling. Thus, in *Dutton,* the United States Supreme Court held that unavailability must be demonstrated unless the possibility of showing unreliability was "wholly unreal"; and in no case identifying the hearsay as crucial evidence has either our Supreme Court or this court found that standard satisfied.

c

When the foregoing principles are applied to the facts of this case, it is apparent that admission of the hospital record violated appellant's rights under the Confrontation Clause.

Appellant was arrested and charged with driving under the influence. The Commonwealth's evidence consisted only of the testimony of the arresting police officer and of Dr. Stein. Dr. Stein read the hospital record entry recording the blood test results, and offered expert testimony on the effect of alcohol on a person of appellant's size and

build. The blood test was done solely for the purposes of possible prosecution for driving under the influence, and the results, .243 percent, not only linked appellant to the offense but gave rise to the presumption that he was under the influence of alcohol. *See* 75 Pa.C.S. § 1547(d). Appellant's testimony either contradicted the officer's or provided an explanation for the officer's observations. The test results were, therefore, in every sense of the word, "crucial" to the prosecution. Indeed, it is fair to say that the results must have done much more than "sharply tip[ ] the scales" against appellant, *Commonwealth v. Pinkins, supra;* in the language of the United States Supreme Court in *Dutton v. Evans,* the results must have been "devastating." 400 U.S. at 87, 91 S.Ct. at 219.

It is equally plain that one may not dismiss as "wholly unreal", *Dutton v. Evans, supra,* the possibility of cross-examination showing that the test results were unreliable. One may accept as true the proposition that " '[p]roviding a careful technique is used' ", *Commonwealth v. Seville, supra* 266 Pa.Super. at 593, 405 A.2d at 1265, the margin of error in the results of a blood alcohol test should be small. The issue, however, was whether a careful technique *was* used, and on that issue it is by no means "wholly unreal" to suppose that cross-examination might have been important. Dr. Stein had not seen the test conducted; the hospital report contained no information, either regarding whether the test had been conducted according to the protocol designed by Dr. Stein, or regarding the equipment used; and Dr. Stein, not having seen the test conducted, could not supply any of this missing information. To state the point differently: because appellant was denied the right of cross-examining the technician, he was wholly unable to challenge the test results.

The test results being "crucial", and the prospect of cross-examination of the technician not being "wholly unreal", it was the Commonwealth's burden either to produce, or demonstrate the unavailability of, the technician. The Commonwealth, however, did not meet its burden, for it

"failed either to produce [the technician] or to adduce reasons for his unavailability." *Commonwealth v. Pinkins, supra*, 343 Pa.Super. at 52, 493 A.2d at 1369.[16]

I should vacate the judgment of sentence and remand for new trial.

16. Given the facts of this case, I need not address, and I intimate no view, on the issue of the admissibility of a hospital laboratory report containing test results where the Commonwealth establishes the technician's unavailability.