J. A21032/20

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA, : IN THE SUPERIOR COURT OF
                                            :            PENNSYLVANIA
              Appellant      :
                                            :
                v.                 :           No. 884 EDA 2020
                                            :
ERNEST PRIOVOLOS           :

Appeal from the Orders Entered February 5, 2020,
and February 26, 2020,
in the Court of Common Pleas of Bucks County
Criminal Division at No. CP-09-CR-0005571-2018

BEFORE: LAZARUS, J., DUBOW, J., AND FORD ELLIOTT, P.J.E.

MEMORANDUM BY FORD ELLIOTT, P.J.E.:      **FILED DECEMBER 15, 2020**

The Commonwealth appeals[1] from the February 5 and February 26, 2020 orders, granting, in part, the ***omnibus*** pre-trial suppression motion filed by appellee, Ernest Priovolos. After careful review, we reverse the suppression orders and remand for proceedings consistent with this memorandum.

The suppression court's extensive findings of fact, in relevant part, are as follows:

> 21. On August 2, 2018, at approximately 12:04 a.m. Officer [Ryan] Crescenzo was on duty in a marked patrol car in the area of Easton

---

[1] The Commonwealth certified, pursuant to Pa.R.A.P. 311(d), that the suppression court's February 5 and February 26, 2020 orders will terminate or substantially handicap the prosecution.

Road and Bristol Road, Warrington Township, Bucks County, Pennsylvania.

. . . .

23. At that date and time, Officer Crescenzo observed a white Ford pickup truck travelling on Easton Road with an inoperable third brake light.

24. Officer Crescenzo observed the pickup truck slowing down at the traffic light at the intersection and make a legal right hand turn onto eastbound Bristol Road.

25. There is no shoulder on Bristol Road at that location.

26. Officer Crescenzo followed the pickup truck, at which point the pickup truck turned into the parking lot of a restaurant, Villa Barolo, which was approximately a couple hundred feet from the intersection.

27. After the pickup truck began turning into the parking lot, Officer Crescenzo activated the overhead emergency lights on his patrol car and initiated a traffic stop.

28. Officer Crescenzo initiated the vehicle stop because of the inoperable third brake light.

29. When Officer Crescenzo initiated the vehicle stop, he had no knowledge that [appellee] had been previously stopped for the same motor vehicle code violation.

30. The pickup truck initially pulled into the Villa Barolo parking lot, but then continued driving forward in the parking lot as Officer Crescenzo was placing his patrol car in park.

31. Officer Crescenzo then followed the pickup truck to maintain proper distance, at which point the pickup truck driver slammed on the brakes and exited the vehicle and began screaming at Officer Crescenzo, "Why did you pull me over?"

32. [Appellee] was the driver of the pickup truck.

33. After exiting the pickup truck, [appellee] walked toward Officer Crescenzo's vehicle, at which point Officer Crescenzo exited his patrol car.

34. After repeated requests by Officer Crescenzo for [appellee] to return to his vehicle, [appellee] finally complied and got back into his vehicle.

35. Officer Crescenzo observed that [appellee] was "extremely sweaty [and] dripping sweat," and that he exhibited erratic emotions[,] which fluctuated from being uncooperative, extremely agitated and angry, to being compliant and apologetic.

. . . .

39. After [appellee] returned to his vehicle, Officer Crescenzo approached [appellee] and asked him to produce his driver's license and vehicle registration.

40. [Appellee] was unable to produce his license or registration, and provided the excuse that his license was stolen and he had just recently placed the registration tags on the vehicle.

41. In lieu of his license, [appellee] provided Officer Crescenzo with a health card containing his name and date of birth.

42. In response to Officer Crescenzo's inquiry, [appellee] stated he was coming from work and going home.

43. Officer Crescenzo observed that [appellee's] face appeared "droopy" and that [appellee] began chewing a piece of gum.

44. After obtaining [appellee's] name and date of birth, Officer Crescenzo ran that information through his mobile data terminal, which revealed that [appellee] had an active arrest warrant out of Philadelphia.

45. Officer Crescenzo returned to [appellee], at which time Officer [Aaron] Menzies and two other police officers, Officer [Jay] Aita, and Sergeant [Glen] Gothenburg, arrived on the scene.

46. [Appellee] was asked to exit his vehicle and Officer Crescenzo asked [appellee] to perform the walk-and-turn, one-leg stand and the fingertip-to-nose field sobriety tests.

47. Despite the chewing gum that [appellee] had recently begun chewing, Officer Crescenzo was able to smell the odor of alcohol emanating from [appellee].

48. When Officer Crescenzo asked [appellee] to remove the chewing gum from his mouth, the odor of alcohol increased as [appellee] spoke.

49. Officer Crescenzo further observed that [appellee's] eyes were extremely glassy and bloodshot, and [appellee] was "sweating."

50. From his observations of [appellee], Officer Crescenzo believed, from his training and experience, that [appellee] was impaired and under the influence.

51. Although he was not asked, [appellee] stated to Officer Crescenzo that he had a preexisting medical injury consisting of a bad hip and that he would have difficulty in performing the field sobriety tests.

52. Officer Crescenzo asked [appellee] to first perform the walk-and-turn, or heel-to-toe, field sobriety test.

53. Officer Crescenzo testified that [appellee] understood the instructions but then had difficulty in performing the test in that he failed to take steps in a heel-to-toe fashion, fell off the line multiple times, completed the turn improperly and raised his arms for balance.

54. Officer Crescenzo then asked [appellee] to perform the one-leg[-]stand field sobriety test and count to "Thirty Mississippi."

55. Officer Crescenzo testified that [appellee] understood the instructions but then frequently used his arms for balance, placed his leg on the ground shortly after raising it, and miscounted throughout the test.

56. Although Officer Crescenzo instructed [appellee] to count to Thirty Mississippi when he performed the test, when he demonstrated to [appellee] how to count during the test, Officer Crescenzo only counted to Twelve Mississippi.

57. Officer Crescenzo then asked [appellee] to perform the fingertip-to-nose field sobriety test.

58. Officer Crescenzo testified that [appellee] indicated he understood the directions but then failed to follow those directions by not keeping his head back, by not closing his eyes during the test, and then touching the bridge of his nose instead of the tip of his nose with his pointer finger.

59. Officer Crescenzo then asked Officer Menzies to conduct the Horizontal Gaze Nystagmus Test and the Modified Romaberg Balance Test with

[appellee], and observed [appellee] perform the tests.

60. Officer Menzies testified that while he conducted the tests he observed a "multitude" of indicators of impairment in [appellee], including unsteadiness and frequent lifting of his arms for balance.

61. Officer Menzies testified that while conducting the Horizontal Gaze Nystagmus Test, [appellee] had difficulty in keeping still, and Officer Menzies had to instruct [appellee] to hold his own chin to keep it steady so he could focus his attention.

62. Officer Menzies testified that when he conducted the Modified Romberg Balance Test, [appellee] exhibited several indicators of impairment, including eye and body tremors, and [appellee] finished the test in either eighteen or twenty (18 or 20) seconds, and not the required thirty (30) seconds as instructed.

63. Although [appellee] told Officer Crescenzo that he had a hip issue, he did not indicate to Officer Menzies that he was unable to perform any of the requested tests or that he had any pain in his neck or back.

64. Video recordings made by Officer Crescenzo's body camera and vehicle dash cam demonstrating [appellee's] performance of those tests were played in court.

65. Officer Menzies testified that he observed that [appellee] had a very hard time focusing on the pen while performing the Lack of Convergence Test, and [appellee] was swaying back and forth, and exhibited eye and body tremors.

66. Officer Menzies advised Officer Crescenzo of his observations of impairment but did not inform him of his own opinion, as it was

Officer Crescenzo's responsibility to determine if [appellee] was impaired.

67.   Officer Crescenzo observed that [appellee] performed the Modified Romberg Test in a "significantly shorter" time than he was instructed.

. . . .

71.   Based upon his observations of [appellee's] attempts to perform those tests, as well as the totality of circumstances of this vehicle stop, including [appellee's] driving behavior of slowing down, accelerating, jamming on his brakes, exiting the vehicle, and the fluctuating emotions he subsequently exhibited, Officer Crescenzo formed the opinion that [appellee] was incapable of safe driving. He therefore placed [appellee] under arrest.

72.   [Appellee] was handcuffed upon his arrest, but he was not advised of his ***Miranda***[2] rights.

73.   After [appellee] was placed under arrest, he asked Officer Crescenzo what the result of his portable breathalyzer test was, and when he was advised it was 0.077, [appellee] stated "that is legal."

74.   After his arrest, [appellee] was placed in Officer Crescenzo's patrol car and thereafter transported to the Police Station in order to process the warrant issued out of Philadelphia.

75.   During his transport to the police station, [appellee] made statements to Officer Crescenzo while riding in the backseat of the patrol car.

---

[2] ***Miranda v. Arizona***, 384 U.S. 436 (1966).

> 76. Because it was raining heavily, [appellee] was transported to the police headquarters in order to read him the PennDOT Form DL-26B.

Decision and order, 2/5/20 at 4-11, ¶¶ 21, 23-35, 39-67, 71-76 (citations to notes of testimony omitted).[3]

The relevant procedural history of this case, as gleaned from the suppression court's opinion, is as follows:

> Appellee was . . . subsequently charged with various offenses including, **inter alia**, [driving under the influence of alcohol ("DUI")], 75 Pa.C.S.[A.] § 3802(a)(1).[4] Appellee filed a motion to suppress "the observations of him, his statements, field

---

[3] The suppression court set forth the following additional findings of fact in its supplemental decision and order:

> 2. Prior to asking [appellee] to perform the field sobriety tests, Officer Crescenzo asked [appellee] if he had anything to drink that night, and [appellee] replied "very . . . nothing, nothing heavy duty."
>
> . . . .
>
> 4. After [appellee] submitted to the preliminary breath test, Officer Crescenzo asked [appellee], "I thought you didn't have anything to drink?" to which [appellee] replied "Earlier today." Officer Crescenzo then asked [appellee], "When was your last drink?" and [appellee] replied, "I'd say about two hours ago."

Supplemental decision and order, 2/26/20 at 2, ¶¶ 2, 4 (citations omitted).

[4] Appellant was also charged with the summary offenses of operating a vehicle without proper rear lighting, operating a vehicle without an official certificate of inspection, failure to carry vehicle registration, and failure to carry and exhibit a driver's license on demand. **See** 75 Pa.C.S.A. §§ 4303(b), 4703(a), 1311(b), and 1511(a), respectively.

sobriety testing, and his refusal to submit to blood testing." [*See* "Motion to Suppress Physical Evidence and Statements," 1/9/19 at 2.)]

After an evidentiary hearing held on December 11, 2019, and subsequent submission of proposed Findings of Fact and Conclusions of Law by both parties, th[e suppression c]ourt entered a Decision and Order on February 5, 2020, denying [a]ppellee's motion "in all respects, with the exception that any statement(s) [appellee] made in response to any questioning or inquiry by the police officers after the vehicle stop is/are suppressed." [(*See* decision and order, 2/5/20.)]

On February 18, 2020, the Commonwealth filed a Motion to Reconsider Suppression Decision and/or Motion for Additional Findings of Fact and Conclusions of Law. The Motion requested that th[e suppression c]ourt reconsider its decision regarding the suppression of statements made prior to arrest, and to place on the record additional findings of fact and conclusions of law relating to the admissibility of those statements as *Miranda* warnings were not required.

In response, th[e suppression c]ourt issued a Supplemental Decision and Order on February 26, 2020, which included additional findings of fact and conclusions of law and an Order granting the Commonwealth's motion in part, clarifying that any statements made by [a]ppellee prior to the arrival of police officers Menzies, Aita and Gothenberg, were not suppressed, **while confirming the suppression of any statements made by [a]ppellee in response to police questioning after their arrival, because we determined that [a]ppellee had been placed into "functional custody" once four (4) police officers were on the scene.**

Suppression court opinion, 4/23/20 at 2-3 (some internal quotation marks omitted; emphasis added).

In reaching this conclusion, the suppression court made the following pertinent conclusions of law in its supplemental decision and order:

> 9. However, in accordance with our Conclusion of Law No. 34 from our February 5, 2020 Decision and Order, the arrival of Officers Menzies, Aita and Gothenburg created a "police dominated" atmosphere which resulted in the potential appearance of a coercive environment where [appellee] was confined to his vehicle and not free to leave, and which therefore resulted in the functional equivalent of his arrest.
>
> 10. Therefore, any statements [appellee] may have made in response to inquiries by the police officers after the arrival of Officers Menzies, Aita and Gothenburg, and in the absence of any **_Miranda_** warnings, are suppressed.

Supplemental decision and order, 2/26/20 at 5, ¶¶ 9-10.

The Commonwealth filed a timely notice of appeal on March 6, 2020. On March 10, 2020, the suppression court ordered the Commonwealth to file a concise statement of errors complained of on appeal, in accordance with Pa.R.A.P. 1925(b), within 21 days. The Commonwealth filed its timely Rule 1925(b) statement on March 23, 2020, and the suppression court filed its Rule 1925(a) opinion on April 23, 2020.

The Commonwealth raises the following issue for our review:

> Did the [suppression] court err in suppressing statements made by appellee in response to police inquiry during a traffic stop and subsequent field sobriety testing based on the erroneous conclusion that the arrival of three additional officers to the traffic stop had the effect of placing appellee into "functional custody," thereby requiring **_Miranda_** warnings prior to any police questioning, where appellee was in fact

> subject to an investigatory detention and field sobriety testing on suspicion of [DUI], was not otherwise placed under arrest at the time he made such statements, and where, as the record reflects, the presence of additional officers did not create a situation that was so coercive as to constitute the functional equivalent of an arrest?

Commonwealth's brief at 4 (extraneous capitalization omitted).

Our standard of review in addressing a suppression court's order granting a suppression motion is well settled.

> When the Commonwealth appeals from a suppression order, we follow a clearly defined standard of review and consider only the evidence from the defendant's witnesses together with the evidence of the prosecution that, when read in the context of the entire record, remains uncontradicted. The suppression court's findings of fact bind an appellate court if the record supports those findings. The suppression court's conclusions of law, however, are not binding on an appellate court, whose duty is to determine if the suppression court properly applied the law to the facts.
>
> Our standard of review is restricted to establishing whether the record supports the suppression court's factual findings; however, we maintain **de novo** review over the suppression court's legal conclusions.

**Commonwealth v. Korn**, 139 A.3d 249, 253-254 (Pa.Super. 2016) (internal citations and quotation marks omitted), **appeal denied**, 159 A.3d 933 (Pa. 2016).

The crux of the Commonwealth's argument is that the suppression court erred in suppressing incriminating statements appellee made to police following the arrival of three additional officers at the scene of the lawful traffic

stop. (Commonwealth's brief at 12.) Specifically, the Commonwealth avers that **Miranda** warnings were not required for Officer Crescenzo to make general inquiries of appellee during a routine investigatory detention following a traffic stop, and that the arrival of Officers Menzies, Aita, and Sergeant Gothenberg did not elevate the encounter into a custodial interrogation that necessitated **Miranda** warnings. (**Id.** at 20-26.) We agree.

This court has long recognized that there are three categories of interactions between police and citizens:

> The first of these is a "mere encounter" (or request for information) which need not be supported by any level of suspicion, but carries no official compulsion to stop or to respond. The second, an "investigative detention" must be supported by a reasonable suspicion; it subjects a suspect to a stop and a period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of an arrest. Finally, an arrest or "custodial detention" must be supported by probable cause.

**Commonwealth v. Way**, 238 A.3d 515, 518 (Pa.Super. 2020) (citation omitted).

A custodial interrogation for purposes of **Miranda** occurs when there is a "questioning initiated by the police after a person has been taken into custody or otherwise deprived of his or her freedom of action in any significant way." **Commonwealth v. Clinton**, 905 A.2d 1026, 1032 (Pa.Super. 2006) (citations and emphasis omitted), **appeal denied**, 934 A.2d 71 (Pa. 2007). In determining whether police conduct is the functional equivalent of interrogation, this court has noted that,

> [t]he police officer's subjective intent does not govern the determination but rather the reasonable belief of the individual being interrogated. . . . The standard is an objective one, with due consideration given to the reasonable impression conveyed to the person being interrogated. A person is considered to be in custody for the purposes of *Miranda* when the officer's show of authority leads the person to believe that [he] was not free to decline the officer's request, or otherwise terminate the encounter.

*Commonwealth v. Harper*, 230 A.3d 1231, 1237 (Pa.Super. 2020) (citations omitted). Thus, "the inquiry must look at the suspect's perceptions rather than the intent of the police." *Commonwealth v. Gaul*, 912 A.2d 252, 255 (Pa. 2006) (citation omitted), *cert. denied*, 552 U.S. 939 (2007).

Although we are mindful of the fact that "not every statement made by an individual during a police encounter constitutes an interrogation," *Commonwealth v. Page*, 59 A.3d 1118, 1131 (Pa.Super. 2013) (citation omitted), *appeal denied*, 80 A.3d 776 (Pa. 2013), it is undisputed that "[a] law enforcement officer **must** administer *Miranda* warnings prior to custodial interrogation." *Commonwealth v. Schwing*, 964 A.2d 8, 11 (Pa.Super. 2008) (citation omitted; emphasis added), *appeal denied*, 989 A.2d 916 (Pa. 2009).

> It is a fundamental precept enshrined in the United States Constitution that a suspect subject to a custodial interrogation by police must be warned that he has the right to remain silent, that anything he says may be used against him in court, and that he is entitled to the presence of an attorney.

***Commonwealth v. Cruz***, 71 A.3d 998, 1003 (Pa.Super. 2013) (citation omitted), ***appeal denied***, 81 A.3d 75 (Pa. 2013).

It is well settled in this Commonwealth that,

> [a] traffic stop constitutes an investigative rather than a custodial detention, unless, under the totality of the circumstances, the conditions and duration of the detention become the functional equivalent of arrest. Since an ordinary traffic stop is typically brief in duration and occurs in public view, such a stop is not custodial for ***Miranda*** purposes.

***Commonwealth v. Mannion***, 725 A.2d 196, 202 (Pa.Super. 1999) (***en banc***) (citations omitted).

> The factors a court utilizes to determine, under the totality of the circumstances, whether a detention has become so coercive as to constitute the functional equivalent of arrest include: the basis for the detention; its length; its location; whether the suspect was transported against his or her will, how far, and why; whether restraints were used; whether the law enforcement officer showed, threatened or used force; and the investigative methods employed to confirm or dispel suspicions.

***Commonwealth v. Baker***, 24 A.3d 1006, 1019-1020 (Pa.Super. 2011) (citations omitted), ***affirmed***, 78 A.3d 1044 (Pa. 2013).

> An ordinary traffic stop becomes "custodial" when the stop involves coercive conditions, including, but not limited to, the suspect being forced into a patrol car and transported from the scene or being physically restrained. Such coercive conditions constitute "restraints comparable to arrest" so as to transform the investigative nature of an ordinary traffic stop into custodial interrogation.

*Mannion*, 725 A.2d at 202; *see also Commonwealth v. Sullivan*, 581 A.2d 956, 957-958 (Pa.Super. 1990) (holding that a defendant-motorist was not in custody for *Miranda* purposes when subject to an ordinary traffic stop, and not placed under arrest, forced to enter a police patrol car, subjected to coercion, or subject to prolonged questioning).

Thus, "police need only give *Miranda* warnings while detaining a suspect by the side of a public highway when the suspect is actually placed under arrest or when the questioning of the suspect is so prolonged or coercive as to approximate the atmosphere of a station house interrogation." *Commonwealth v. Toanone*, 553 A.2d 998, 1003 (Pa.Super. 1989) (citations and footnote omitted).

Instantly, our review of the record in this matter reveals that appellee's statements to police prior to his formal arrest were admissible without *Miranda* warnings, as they were made during the course of an investigatory detention, and not a custodial interrogation. The suppression court's determination that the arrival of Officers Menzies, Aita, and Sergeant Gothenburg at the scene of the traffic stop elevated appellee's interaction with police to a custodial interrogation is unsupported by the record. Viewed under a totality of the circumstances, the record establishes that appellee was subject to an investigatory detention during a routine traffic stop in a public parking lot, and Officer Crescenzo made reasonable investigative inquiries after observing several indicators of intoxication. (*See*

notes of testimony, 12/11/19 at 13-25.) During the course of this investigation, appellee was never placed in handcuffs, transported to another location against his will, or subjected to investigative methods beyond routine field sobriety testing and questioning by Officers Crescenzo and Menzies. (*Id.* at 25-35, 109-119.) The mere arrival of three additional officers to the scene of the traffic stop, in and of itself, did not create what the suppression court characterized as a 'police-dominated atmosphere' nor subject appellee to "prolonged or coercive . . . interrogation," thereby elevating the encounter to a custodial interrogation. *See Toanone*, 553 A.2d at 1003. Accordingly, *Miranda* warnings were not required.

Based on the foregoing, we find that the suppression court improperly granted, in part, appellee's motion to suppress. Accordingly, we reverse the suppression court's February 5 and February 26, 2020 orders, and remand this case for trial.

Order reversed. Case remanded for trial. Jurisdiction relinquished.

Judgment Entered.

_____

JosephD.Seletyn,Esq.
Prothonotary

Date: <u>12/15/2020</u>

- 16 -